## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **HALYM HWANG,** )<br>An individual, )<br> )<br> )<br> Plaintiff, )<br> )<br> v. )<br> )<br>**THE BOARD OF EDUCATION** )<br>**FOR OAK PARK AND RIVER FOREST** )<br>**HIGH SCHOOL DISTRICT 200, LISA** )<br>**MAKELY, JULEE TERRETTA,** and )<br>**OTHER UNKNOWN INDIVIDUALS,** )<br> )<br> Defendants. ) | Case No. |

## COMPLAINT AT LAW

NOW COMES the Plaintiff, HALYM HWANG ("Plaintiff"), by and through her

attorneys, Parikh Law Group, LLC, and for her Complaint at Law ("Complaint"), she states as

follows:

## INTRODUCTION

This action is brought by Halym Hwang, Plaintiff, as a civil action under 42 U.S.C. 1983

seeking damages against the Defendants for committing certain acts with the intent and for the

purpose of depriving the Plaintiff of her rights under the United States Constitution and Illinois

law, including her due process rights and equal protection rights, rights under the Defendant

School District's Policy ("Policy"), retaliation, and intentional infliction of emotional distress.

The Plaintiff was a minor at the time of the events pertinent to this Complaint, but as of filing has

reached the age of majority.

1

## PARTIES

1. The Plaintiff was a sixteen-year-old female high school student residing in Oak Park, Illinois, which is within this Court's territorial jurisdiction. During the events described herein, the Plaintiff was approximately 4'11'', weighed approximately 120 pounds, and was a student enrolled in the Oak Park River Forest High School ("the School").

2. The Board of Education ("BOE") is a group of individuals elected by the public to make decisions and operate the school pursuant to the applicable provisions of the Illinois School Code.

3. At all times relevant to this Complaint, Lisa Makely was employed by the BOE as a social worker at the school.

4. At all times relevant to the Complaint, Julee Terratta was employed by the BOE as a nurse at the school.

5. Other individuals whose identities are currently unknown to the Plaintiff were employed by the BOE at all times relevant to the Complaint and listed this way to preserve Plaintiff's right to name them as defendants when their identities become known.

## JURISDICTION

6. The Court has original jurisdiction in this matter pursuant to 28 U.S.C. §1331 and §1343. The Court has supplemental jurisdiction over Plaintiff's related State and common law claims pursuant to 28 U.S.C. §1367. Venue is proper in this Court pursuant to 28 U.S.C. §1391.

## BACKGROUND FACTS

7. Plaintiff endured a traumatic childhood and was the victim of physical, psychological, and emotional abuse.

8. As a result of the physical, psychological, and emotional abuse she endured at the hands of various individuals who were supposed to protect and support her, the Plaintiff was extremely susceptible to further emotional distress.

9. The Plaintiff was especially untrusting of adults and particularly adults in positions of authority due to the abuses she endured as a child.

10. As a result of the abuse Plaintiff endured, Plaintiff was diagnosed as suffering from post-traumatic stress disorder ("PTSD"), General Anxiety Disorder, and Major Depressive Disorder. The Plaintiff is also diagnosed as being on the autism spectrum.

11. Due to her emotional and physical disabilities as well as the medication she took to help manage and control her conditions and disabilities, Plaintiff would occasionally suffer from episodes where she would need to be left alone and provided space and time to allow for the episode to pass.

12. In connection with the episodes described above, the Plaintiff would oftentimes experience tics, rapid and repetitive muscle movements resulting in sudden body jolts or sounds.

13. The tics that the Plaintiff would suffer would occasionally appear to be painful or otherwise dangerous; however, the Plaintiff's physician informed the Plaintiff she was under no threat of harm during the episodes.

14. The Plaintiff provided the school's nurse defendant Terretta with notice and Plaintiff's doctor's notes of the physical and mental conditions afflicting Plaintiff.

3

The Plaintiff provided defendant Terretta with documents from Plaintiff's physician in addition to verbal instructions to further communicate the gravity of the conditions and the need for Plaintiff to receive accommodations such that her debilitating conditions were not exacerbated. *See Exhibit A*.

15. Specifically, the Plaintiff provided defendant Terretta a note from her physician that instructed the School not to intervene during an instance where the Plaintiff was experiencing an episode. *See Exhibit A*.

16. The Plaintiff met regularly with School administrators due to her physical, emotional, and psychological condition. The Plaintiff repeatedly advised the School's administrative staff, including the School's social worker, defendant Makely, and the School's nurse, defendant Terretta, that being physically touched during an episode would exacerbate her PTSD and would cause immeasurable pain.

17. The defendants knew or should have known that the Plaintiff is afflicted by the following diagnosis and/or conditions:

    a. PTSD;

    b. Generalized Anxiety Disorder; and,

    c. Major Depressive Disorder.

18. The defendants knew or should have known that the Plaintiff was on medications to treat and control her conditions. While experiencing an episode, the defendants knew or should have known the Plaintiff required space, time, and that being physically touched would greatly exacerbate her existing PTSD.

19. On or about February 9, 2022, Plaintiff was walking to class between periods when she began experiencing an episode, which manifested in the form of significant

4

dizziness, nausea, and extreme sensitivity to light, all of which were symptoms that Plaintiff regularly dealt with due to her medical conditions and the medication she takes to help control her medical conditions.

20. As Plaintiff's symptoms intensified, she found a safe place to sit down inside the threshold of her next period's classroom.

21. Plaintiff elected to sit on the floor in an effort to keep herself and her classmates safe. By sitting on the floor, Plaintiff reduced the likelihood she may fall and injure herself, lose her balance and fall into a classmate or teacher (hurting herself and others), and/or have her symptoms continue to intensify.

22. While safely seated on the floor, Plaintiff suffered from two tics. These tics that Plaintiff suffers from can appear painful. However, the defendants were previously informed that the condition is not serious and the Plaintiff just needs time for the episode to pass.

23. Crucially, the defendants were instructed to:

    a. not make physical contact with Plaintiff,

    b. not to call a nurse, and

    c. not to call emergency services (including 911).

24. The defendants were advised to allow Plaintiff space and time to recover from the tic episode.

25. The defendants were advised not to intervene, not to physically touch Plaintiff, and not to bring additional staff or emergency personnel because doing so will compound Plaintiff's physical and emotional suffering.

26. The defendants knew or should have known that these instructions were to be followed in the event Plaintiff experienced an episode, especially in light of the various School employees involved with Plaintiff and Plaintiff's 504 plan. *See Exhibit B*.

27. Despite being expressly instructed what to do and what not to do, the defendants ignored the instructions provided by the Plaintiff and her medical professionals.

28. As Plaintiff sat on the ground and focused her efforts and energy on resting to allow the episode she was experiencing to pass, a member of the School staff immediately called the nurse at the School.

29. The Plaintiff did not pose a threat to herself while she sat quietly inside the classroom allowing for her episode to pass.

30. The Plaintiff did not pose a threat to any other members of the School, including staff or classmates, while she sat quietly on the floor in an effort to allow her episode to pass.

31. Within moments, the Plaintiff, who was still seated quietly and in a manner that presented no risk or potential harm to anyone, was approached by not only the School's nurse, but also by the defendant SRO.

32. Defendant nurse Terretta immediately began touching Plaintiff, petting her back and invading her personal space. Defendant Terretta did not perform an evaluation or check the Plaintiff's vitals; instead, she placed her hands on Plaintiff's back and repeatedly patted Plaintiff on her back, shoulders, neck, and head.

33. An agent of the School then summoned defendant Makely to come to the classroom with the intention that the School social worker interact with Plaintiff.

34. Makely arrived to the classroom where Plaintiff was still seated on the floor. Makely also began touching and patting Plaintiff on her back, shoulders, neck, and head without the Plaintiff's consent. Makely had previously been provided with all necessary information regarding Plaintiff and her conditions and knew or should have known to follow the instructions provided in addressing Plaintiff's episode.

35. The Plaintiff never consented to being touched by any School employee on February 9, 2022, and as School employees touched her, the Plaintiff's mental anguish increased.

36. By touching the Plaintiff, the defendants ignored and actively defied the medical instructions that the Plaintiff provided the school.

37. Plaintiff repeatedly pulled away and attempted to avoid being touched, clearly communicating to the School's staff that its touching was unwarranted and unwanted.

38. A vital part of managing Plaintiff's condition is to avoid drawing additional attention to her while she is experiencing a momentary tic.

39. A vital part of managing Plaintiff's condition is to avoid touching her while she is experiencing a momentary tic.

40. While on the ground and being touched repeatedly by multiple school employees/ agents against her will, Plaintiff could feel the other students in the classroom staring at her. Plaintiff could hear the students whispering and speaking in disparaging ways about Plaintiff because of the events unfolding involving Plaintiff's medical condition, which was being exacerbated by the defendants' intentional conduct in calling additional personnel into the room and repeatedly touching Plaintiff.

41. As a result of the defendants' escalation of the episode the Plaintiff was experiencing, the Plaintiff felt a burn of humiliation and embarrassment as she remained prone on the floor in front of her peers.

42. After some time, the children in the room were excused, leaving the Plaintiff alone with a room of adults who were all employees of the BOE.

43. As a result of the defendants' actions in ignoring the express medical instructions required for Plaintiff to avoid certain injury, the Plaintiff stood up and proceeded towards a window in the classroom in hopes fresh air would alleviate the intense stress she was under.

44. Plaintiff walked across the classroom at a slow and calm pace, and the Plaintiff did not speak or make any noises as she walked across the classroom.

45. While Plaintiff walked towards the window, she was tackled to the ground from behind by at least one adult who was significantly larger than her. The Plaintiff believes the SRO was the individual who tackled her to the ground. The SRO is approximately 6'2'' and weighs approximately 230 pounds, which is considerably larger than the Plaintiff.

46. At no point prior to being tackled did any of the adults audibly communicate with the Plaintiff with any verbal instructions.

47. The sudden impact from the tackle, as well as the sheer surprise of being tackled without warning, violently sent the Plaintiff towards the ground. On her way to the ground, the Plaintiff's head struck a table in the classroom and Plaintiff lost consciousness.

48. Plaintiff was the smallest person in the room and was dwarfed in size and strength by many of the adults, including the SRO who had been summoned with the nurse.

49. The defendants owed a duty to the Plaintiff to follow the medical instructions she provided.

50. The defendants also owed plaintiff a duty not to use excessive force and not to place her in a dangerous position.

51. The defendants exacerbated Plaintiff's pain, suffering, and humiliation by ignoring the medical instructions the Plaintiff provided the defendants.

52. After being tackled to the ground, Plaintiff estimates there were 8 adults who prevented her from moving. At least 3 adults physically restrained the Plaintiff by holding her legs and wrists against the floor.

53. Although not officially diagnosed, the Plaintiff suffered a concussion as a result of being tackled to the ground by who she believes to be the SRO. Plaintiff continues to suffer from post-concussive symptoms from this incident.

54. Defendants and other unknown BOE employees continued to yell loudly at the Plaintiff while she was pinned to the floor by multiple adults, nearly all of whom dwarfed Plaintiff in size and strength.

55. Eventually, the Plaintiff was able to communicate to the defendants and other BOE employees that breathing was becoming difficult. In response, the School removed the surgical mask the Plaintiff was wearing, which did not significantly increase the amount of air that Plaintiff was able to receive.

56. Being unable to breathe continued to elevate the extreme mental and physical stress the School inflicted upon the Plaintiff.

57. Plaintiff estimates there were eight adults in the classroom alone with her. Two of the adults stood in front of the classroom door to block it, making certain Plaintiff could not exit.

58. At no point during her interaction with the defendants and other BOE employees did the Plaintiff express any desires to harm herself or others.

59. At no point during her interaction with the defendants and other BOE employees did the Plaintiff physically threaten any other individual, nor did she have a weapon. Due to her diminutive stature, the Plaintiff posed no risk to any adult.

60. Plaintiff had not committed any crime or engaged in any other form of misconduct.

61. The School telephoned the police, in further contravention of the medical instructions that controlled how the Plaintiff needed to be treated due to her conditions.

62. The police arrived with paramedics.

63. Defendants eventually telephoned the Plaintiff's mother but would not allow the Plaintiff to speak with her mother, despite the obvious severity of the situation and Plaintiff's intense emotional distress.

64. The defendants knew or should have known that it should call Plaintiff's mother immediately since Plaintiff's mother had the ability to calm Plaintiff and since the defendants knew about Plaintiff's close relationship with her mother.

65. The police and/or paramedics began questioning Plaintiff while she was restrained in a hospital bed. Plaintiff was asked whether she was homicidal or suicidal, both of which she denied.

66. At the hospital and as a direct result of having her head slammed into a table and on the floor while being tackled by the SRO, the Plaintiff's headache intensified and she felt confused.

67. Plaintiff was brought to Rush Oak Park Hospital ("Rush Hospital") and was placed in hard restraints. The restraints caused pain and injury to Plaintiff, including causing Plaintiff to lose the pulse in one of her hands and being compromised on the other hand.

68. Eventually, Plaintiff's mother, Ms. Hwang, was notified by a school counselor that an incident occurred involving Plaintiff, whereupon Plaintiff's mother traveled to Rush Hospital to see her daughter. Upon arriving, Ms. Hwang was shocked to find her daughter restrained in such an aggressive manner.

69. Only upon Ms. Hwang's insistence did the staff at the hospital remove the restraints from Plaintiff.

70. Separately, defendant Makely spoke privately with a physician at Rush Hospital. Makely falsely informed the physician that Plaintiff suffered from suicidal thoughts, psychosis, and hallucinations. Plaintiff did not and does not suffer from suicidal thoughts, psychosis, or hallucinations.

71. Relying on defendant Makely's false information, Plaintiff was fitted in a psychiatric gown and told by the doctor who spoke with Makely that Plaintiff "should get comfortable" because she was mentally ill and would be in a psychiatric ward for "some time." Plaintiff was subsequently transferred to a psychiatric hospital facility against her will.

72. Ms. Hwang expressed her displeasure with the defendants for how badly they mishandled a situation that was common for Plaintiff to encounter, and a situation that the Plaintiff provided instructions for how to handle.

73. Prior to the February 9, 2022 events, Plaintiff was a gifted student who excelled in many different categories, including participating and excelling in Science Olympiad, Scholastic Bowl, and the Japanese Club.

74. On March 3, 2022, after Ms. Hwang complained to the School that it had mishandled the situation and caused a great deal of stress upon Plaintiff, there was a scholastic bowl after school hours that Plaintiff wished to attend.

75. Upon arriving, Plaintiff was told she must leave by the club sponsor Richard Mertz at the School who spotted her.

76. The following day, on March 4, 2022, the Schools' Director of Student Services Faith Cole as well as counselor Carolyn Ojikutu made an unannounced visit to Plaintiff's home. Upon arriving, the Director of Student Services informed Plaintiff that she was no longer allowed back at school. *See Exhibit C.*

77. Plaintiff was advised by counselor Carolyn Ojikutu via e-mail that she would only be able to return to school following the School's conducting of a re-entry meeting. *See Exhibit C.*

78. Plaintiff did not have this re-entry meeting until the end of May 2022, just days before the school year was ending.

79. Plaintiff missed the remainder of her junior year of high school following the February 9, 2022 incident.

12

80. Little to no efforts were made by the defendants to assist in the process of ensuring Plaintiff could return in a timely manner.

81. Plaintiff had been effectively, either actually or constructively, suspended from the School.

82. Plaintiff did not receive any homebound learning until May 5, 2022.

83. Plaintiff was given limited time to complete three (3) months' worth of school work and tests.

84. As a result, Plaintiff was able to pass her English, Japanese and Psychology classes; however, she was forced to withdraw from other courses she was enrolled in as she was unable to pass and because the classes required Plaintiff to be physically present in School.

85. The BOE has adopted various board policies. School Board Policy 7:200 pertains to Suspension Procedures.

86. School Board Policy 7:200 provides a procedure that the School is to follow when students will be suspended out of school. Amongst other procedures, the School Board Policy states that a conference would take place wherein any charges supporting the suspension would be explained, the student would get an opportunity to respond to each allegation prior to being suspended, a phone call to the student's parent, a written notice to be provided by the School to the student's parent, and a summary of the notice provided to the Board.

87. The defendants failed completely to follow its own policy and failed to provide Plaintiff with the opportunity to respond to any allegations supporting her disallowance at the School.

88. As a result of the February 9, 2022 incident, Plaintiff has been diagnosed or is in the process of being diagnosed and has suffered from the following:

    a. Post-Concussive Syndrome

    b. Benign Paroxysmal Positional Vertigo

    c. Fibromialgia

    d. Myalgia

    e. Functional Neurological Disorder symptoms

    f. Complex Regional Pain Syndrome

    g. Postural Orthostatic Tachycardia Syndrome

    h. Radial and Ulnar Nerve Compression (left and right arms)

    i. Ehlers Danlos Syndrome

    j. Pruritus

    k. Prurigo Nodularis

89. For the above medical conditions, Plaintiff has and continues to regularly receive treatment and care including opthamology, neurologist, vestibular therapy, rheumatologist, chronic pain treatment and therapy, occupational therapy, dermatology, various medications, and more.

90. As a result of the February 9, 2022 incident, Plaintiff suffers from long-term medical conditions, many of which will require treatment for the duration of Plaintiff's life.

91. Additionally, subsequent to the February 9, 2022 incident, Plaintiff was given an individualized education program ("IEP").

92. Plaintiff's IEP contemplated various items pertaining to Plaintiff's education plan, including accommodations the School was to make for Plaintiff and based on Plaintiff's conditions.

93. Specifically, Plaintiff's IEP provided, but was not limited to, the following:

    a.  Plaintiff to be given an elevator pass

    b.  Plaintiff to have access to her phone while in class

    c.  Plaintiff to have flexible deadlines for completing assignments

    d.  Plaintiff to have time and space to de-escalate when she experiences an episode

    e.  Plaintiff to have preferential seating within her classrooms near a door or a wall

    f.  Plaintiff to have extended time to complete homework

    g.  Plaintiff to receive breaks when overwhelmed or when experiencing an episode

    h.  Plaintiff to have additional time to get to class

    i.  Plaintiff to have extended time for completing tests

94. The defendants failed to provide the accommodations to Plaintiff as contained in her IEP.

95. With respect to the elevator pass, Plaintiff sent multiple e-mails regarding obtaining the pass when her senior year of school began; however, Plaintiff was not given the elevator pass until close to her second semester of school.

96. With respect to Plaintiff's accommodation to possess her phone in class, Plaintiff never received this accommodation except for limited times when Plaintiff had to personally ask teachers for permission.

97. With respect to Plaintiff's accommodation of sitting near a wall or a door, Plaintiff never received this accommodation.

98. With respect to not approaching or touching Plaintiff when she was experiencing an episode, the only accommodation the School attempted was to place a sticker on the back of Plaintiff's student ID with a simple message that indicated Plaintiff was not epileptic.

99. Prior to the February 9, 2022 incident, Plaintiff had a plan pursuant to Section 504 of the Rehabilitation Act, which placed defendants on actual notice of plaintiff's disabilities and required accommodations as described above.

100. Based on Plaintiff's prior 504 plan and all instructions and documents provided to the School, the defendants knew or should have known about Plaintiff's medical conditions and how to respond in the event of an episode.

## COUNT I
## 42 U.S.C. §1983 - VIOLATION OF PLAINTIFF'S DUE PROCESS RIGHTS
### *AGAINST THE BOE, MAKELY, TERREETA*

101. Plaintiff re-alleges her allegations contained in paragraphs 1-101 above as her allegations for this count and said allegations are hereby incorporated by reference.

102. At all times relevant to this Complaint, all defendants acted under color of law.

103. The individual defendants are sued in their individual capacities. At all times relevant to this Complaint, Plaintiff had a constitutional right to be free from excessive force and a right to bodily integrity.

104.    The acts of the defendants described above demonstrate that the defendants, while acting under color of law, violated the Plaintiff's constitutional rights.

105.    As a proximate result of defendants' conduct, Plaintiff suffered severe physical and emotional damages.

**COUNT II**
**VIOLATIONS OF PLAINTIFFS RIGHTS UNDER SECTION 504**
*AGAINST THE BOE*

106.    Plaintiff re-alleges her allegations in paragraphs 1-101 as her allegations for this count and said allegations are incorporated by reference.

107.    This count is brought pursuant to 29 USC 794, et. seq.

108.    The BOE (the school district) is a recipient of federal funds.

109.    Plaintiff was a qualified individual with a disability and a recipient of a 504 plan at the time of the incidents described and as such, was entitled the protections of her 504 plan.

110.    Plaintiff's disabilities substantially limited her in several daily life functions.

111.    The allegations above demonstrate that the defendants had actual knowledge of Plaintiff's disabilities; had actual knowledge of her required accommodations and failed to provide the accommodations required to Plaintiff.

112.    As a proximate result of defendant's failure to accommodate Plaintiff's disabilities, Plaintiff suffered severe physical and emotional injuries.

**COUNT III**
**VIOLATIONS OF THE ADA**
*AGAINST THE BOE*

113.    Plaintiff re-alleges her allegations in paragraphs 1-101 and 107-113 as her allegations for this count and said allegations are incorporated by reference.

114.    This count is brought pursuant to Title II of the ADA, 42 USC 12131 et. seq.

115.    The BOE and/or the district are local governmental entities as defined by law.

116.    This section of the ADA prohibits local public entities from discriminating against qualified individuals with disabilities based on their disabilities.

117.    The alegations above demonstrate that the defendants failed to accommodate Plaintiff's disabilities.

118.    As a proximate result of defendant's failure to accommodate Plaintiff's disabilities, Plaintiff suffered severe emotional and physical injuries.

<u>**COUNT IV**</u>
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
*AGAINST THE BOE, MAKELY, TERREETA*

119.    Plaintiff re-alleges her allegations in paragraphs 1-101 as her allegations for this count and said allegations are incorporated by reference.

120.    The defendants stood in a special relationship to Plaintiff, to wit, student and educational staff.

121.    The defendants had actual knowledge of Plaintiff's disabilities.

122.    The defendants had actual knowledge of actions toward Plaintiff that were not only prohibited by her medical team, but that would cause an exacerbation of her symptoms.  In other words, defendants knew that there was a high probability that their actions toward Plaintiff would likely cause her to suffer severe emotional harm.

123.    Defendants' actions did in fact cause Plaintiff to suffer severe emotional harm distress including but not limited to a psychiatric hospitalization.

124.    In view of the circumstances (e.g. Plaintiff was sitting peacefully in the classroom working though her issues when she was touched, tackled, pinned down to the floor

by eight adults, shackled and sent to a psychiatric hospital), the defendants' actions when Plaintiff posed no risk of harm to herself or others was extreme and outrageous.

**COUNT V**
**VIOLATION OF STATE RIGHT TO EDUCATION**
***AGAINST THE BOE***

125.   At all times relevant to this Complaint, Illinois had a compulsory attendance law (105 ILCS 5/26-1) that required Plaintiff to attend school.

126.   At the same time, Illinois had a law that limited a school administrator's power to exclude a student from school for a maximum of 10 school days (105 ILCS 5/22.6).

127.   Under *Cleveland State Board of Education v. Loudermill*, 470 US 532 (1972) and *Goss v. Lopez*, 419 US 565 (1978), Plaintiff had a clearly-established right to a pre-suspension hearing.

128.   As cited above, the BOE had adopted a policy that entitled the Plaintiff to a pre-suspension hearing.

129.   Similarly, Illinois law provided the Plaintiff with the right to a full evidentiary expulsion hearing before she was excluded from school for any period of time in excess of 10 school days.  *Leak v. Board of Education*, 2015 Ill. App (1st) 1143202

130.   Defendant violated Plaintiff's rights by failing to provide Plaintiff with a pre-suspension hearing and/or an expulsion hearing before they excluded her from school of over three months.

**PRAYER FOR RELIEF (ALL COUNTS)**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against each defendant on each count for:

1. Compensatory damages;

2. Punitive damages against the appropriate defendants;

3. Reasonable attorney's fees and costs; and,

4. Such other or further relief as this Court deems just.


                                          Respectfully submitted,
                                          PLAINTIFF HALYM HWANG


                                          /s/ *Anish Parikh*
                                          One of their attorneys

Parikh Law Group, LLC
Anish Parikh, 6298612
150 S. Wacker Drive, Suite #2600
Chicago, Illinois 60606
(312) 725-3476